JOSEPHINE WHITTAKER et al.

*v.*

BELVIDERE ROLLER MILL COMPANY.

1. When a mortgage securing payment of several bonds is in process of foreclosure, an offer to pay that one of the bonds which is held by the complainant, and the costs of the pending foreclosure to date, accompanied by a demand for an assignment of the bond, is not such a tender as will stop the running of interest or the accruing of costs.

2. Such a demand can only be made in behalf of some person having an equitable right to stand in the place of the holder of the bond, and that right must be disclosed when the demand for assignment is made.

3. The demand must be made upon the holder or some person authorized to make the assignment. A solicitor employed to collect the bond by foreclosure of the mortgage has no power to assign them and is not a proper person upon whom to make a demand for an assignment.

4. Where a tender after suit begun is set up in an answer, the money must be paid into court precedently to or coincidently with the filing of the answer. If the money is not in court on the filing of the answer, the complainant is not compelled to take notice of a subsequent deposit.

5. The right of a second mortgagee to have the assets and securities marshaled so that a preceding mortgagee may be required to look first to the lands on which the second mortgage is not a lien, is absolute against the mortgagor, and against his voluntary fraudulent grantee of the lands on which the second mortgage is not a lien.

6. The purchaser at a foreclosure sale under a second mortgage receives the title which the mortgagor had at the time of the delivery of that mortgage, and attendant upon that title he takes the right which the second mortgagee received, to have the assets marshaled, and he may assert this equity against the subsequent voluntary and fraudulent grantee of the mortgagor.

On bill to foreclose &c.

The bill in this case was originally filed by Josephine Whittaker, as sole complainant, against the Belvidere Roller Mill Company, Adam B. Searles and William H. Searles, executors &c. of Frederick Searles, deceased, and others, defendants, to foreclose a mortgage, with prayer that the defendants answer

under oath, and for the ordinary decree for foreclosure and sale of the mortgaged premises.

On and prior to May 22d, 1890, Adam B. Searles was the owner of four lots of land in the town of Belvidere, lot No. 1 being a mill property situate in and being part of the block lying between Front street, Second street, Depue street and the Delaware river, and the other pieces lying separately and having other uses. At that time Searles was in financial distress and his creditors were pressing him for settlement. He sought to arrange with them, and was able to induce an agreement to be entered into by all but one Hess. The latter refused to parley or delay, and was pushing a suit for his claim against Searles to judgment. Searles made bonds to the complainants and a number of others of his creditors, obligating himself to pay their several debts upon the death of his father, Frederick Searles. These bonds he secured by a mortgage made to the complainants and other several bondholders, and recorded on May 22d, 1890. The mortgage covered lot No. 1 (the mill property) and also lots Nos. 2, 3 and 4, and will hereafter be referred to as the complainants' mortgage.

On May 23d, 1890, Searles made another bond and mortgage to Robert E. Morris and others of his creditors (one of whom was Levi Ott), to secure payment of several bonds also made by him to each creditor. This mortgage was dated and recorded on May 23d, 1890, at twenty minutes past one o'clock in the afternoon, and will hereafter be referred to as the Morris mortgage, and included only lot No. 1, the mill property.

On the same day, May 23d, 1890, Searles conveyed to Levi Ott the whole block lying between Front, Second and Depue streets and the Delaware river, including the mill property, lot No. 1, in the description of that block, and also another lot on South Water street not included in any of the mortgages. This deed was dated May 23d, 1890, and was expressed to be in consideration of $1, and contained a recital that the conveyance was not to be deemed to affect the interests of Ott in the mortgage made by Searles to Morris, Ott and others, on lot No. 1 (part of the property conveyed), but that Ott's interest in

that mortgage was to continue to be a lien on lot No. 1. This deed also contains covenants of seizin, power to convey, general warranty, and against encumbrances, except from certain named mortgages, of which two are those of the complainants and Morris and others. It was recorded May 23d, 1890, at half-past three o'clock in the afternoon.

On the same day, May 23d, 1890, Adam B. Searles conveyed lots Nos. 2, 3 and 4 to his son, Roderick B. Searles, by deed expressed to be for the consideration of $100, with full covenants of seizin, power to convey, general warranty, and against encumbrances, except five mortgages of which the complainants' is one. This deed was recorded May 23d, 1890, at ten minutes past five o'clock in the afternoon.

Neither of these two deeds contained any covenant or agreement on the part of the grantees to pay off any of the encumbrances.

On the 18th day of August, 1890, Ott conveyed to the Belvidere Roller Mill Company lot No. 1 in the complainants' mortgage (the mill property), with a slight variance in the boundary lines, by which the lot conveyed to the roller mill company is somewhat less than that mortgaged to the complainants, leaving the title to two strips of land, parts of lot No. 1 of the mortgaged premises, still remaining in Ott at that date. This deed contains an agreement on the part of the grantee to assume and pay four mortgages, one of which was the complainants', and another the Morris mortgage, as part of the consideration of this conveyance. It was recorded on the 24th day of November, 1890.

The Belvidere Roller Mill Company entered into possession under this conveyance, and paid off a number of the bonds which were secured to be paid by the complainants' mortgage. A number of them, however, remained unpaid. Among these was one held by Josephine Whittaker, the original complainant, and another held by Frederick Searles, who died, in February, 1894, testate, and whose executors have been admitted as complainants and are now prosecuting this suit.

Josephine Whittaker filed the bill in this case on December

20th, 1895, for the foreclosure and sale of all four of the lots constituting the mortgaged premises, making her co-mortgagees and the holders of the Morris mortgage, and the grantees of Adam B. Searles, defendants.   While this suit was pending the holders of the Morris mortgage also foreclosed upon lot No. 1, and it was purchased at the foreclosure sale, from the sheriff, by the defendant Philip M. Miller.   ·

On January 13th, 1896, after he had bid in the property, but before he had any deed, an offer to the solicitor of the complainants in this cause, made on the last-named date, was claimed to be a tender of the amount due to the sole complainant Josephine Whittaker.   This offer was refused because coupled with a demand for an assignment of the claim.   Shortly afterwards, on the 3d day of February, 1896, the executors of Frederick Searles were admitted as parties complainant.

On the 4th day of February, 1896, the defendant Philip M. Miller, as purchaser of lot No. 1 under the Morris mortgage, and the defendants Henry B. Miller, L. De Witt Taylor and John M. Morris, claiming to be holders of certain of the bonds secured by the complainants' mortgage, were admitted as defendants.   At some time after this (the date is left uncertain by the proofs) the amount claimed to have been tendered the complainants' solicitor was paid to the clerk of this court by the defendants' solicitor.

The defendants L. De Witt Taylor, Henry B. Miller and John W. Morris, claiming to be the holders of some of the bonds secured by the complainants' mortgage, filed their joint and several answer setting up their interests as owners of those bonds, and the defendant Philip M. Miller, the owner of lot No. 1, by purchase under the Morris foreclosure, sets up by way of answer and cross-bill, first, the alleged tender and payment to the clerk, which it is asserted satisfied the amount due Josephine Whittaker, then the sole complainant; second, the equity of the defendant Philip M. Miller, as owner of lot No. 1, to have lots Nos. 2, 3 and 4 (title to which stands in the name of Roderick B. Searles) sold and applied to the payment of the complainants' mortgage debt before lot No. 1 is so applied.

The case came to a hearing upon the bill, answer and cross-bill, and testimony was taken in support of the issues raised.

*Mr. John L. Dahlke,* for the complainants.

*Mr. L. De Witt Taylor,* for the defendant.

GREY, V. C.

This case has been discussed upon these points:

*First.* Was there such a tender of the amount due the complainants that it was effectual to require the complainants to accept the money paid to the clerk, and thus stop the interest and costs?

*Second.* Is the bond (one of those secured by the complainants' mortgage) formerly held by Edward B. Searles, and now claimed to be held by Henry B. Miller, still a lawful and unsatisfied claim?

*Third.* If a sale of the mortgaged premises shall be directed, what shall be the order of the sale and application of the several parcels to the payment of the complainants' mortgage?

As to the tender. This bill has been filed in the name of Josephine Whittaker to foreclose the mortgage now in suit. Besides the complainant Whittaker, there were several other persons who held bonds secured to be paid by the mortgage, but the suit was then in her name alone as sole complainant. The subpœnas had been issued and returned. Mr. Taylor, a lawyer, on the 13th day of January, 1896, called on Mr. Dahlke, the complainants' solicitor, at his office, and stated to him that he represented Mr. Miller, John Morris and others; showed him $550, offered it to him, and asked him if he would assign the Josephine Whittaker bond to Mr. Morris. Nothing is proven to have been said to show what right Miller, Morris and others had to make a tender or to demand an assignment. Mr. Dahlke refused to accept the money or to assign the bond. Subsequently Mr. Taylor paid the money to the clerk of the court of chancery. The amount named was intended to be the total of the debt and also the costs of this suit up to that date. At the time

Whittaker v. Belvidere Roller Mill Co.

of the alleged tender, January 13th, 1896, Josephine Whittaker was the sole complainant, and it is contended that the offer made satisfied her claim and terminated her right to any additional interest or costs in this suit.   The efficiency of the tender claimed to have been made is denied upon the ground that the offer was not a tender of the payment of the bond, but a proposition to purchase it.   To make an effectual tender, it must appear that at the time when it was made the party making it had the right to tender payment of the debt, as in the case of the debtor himself or his representatives, or the holder of the title to the estate on which the debt was a lien; or that he had the right to require a transfer of it, as in the case of subrogation of a surety, or redemption sought by the holder of some subsequent lien having that equity.   The demand should clearly disclose the right of the party making the offer, so that the creditor may be notified of his duty to accept.   The party to whom the tender is made must be the holder of the debt, or some person representing him who has, at the time of the tender, power to accept it, and if the circumstances call for a transfer of the debt, has also power to assign it.   The offer proven in this case was clearly not one to pay and satisfy the debt.   It was a request to assign it upon payment of the amount due.   The attorney who made it himself testifies that the complainants' solicitor offered to accept the money and deliver over the bond canceled.   This was refused.   The solicitor was willing to accept payment and cancel the bond, but he would not assign it.   No evidence has disclosed that Mr. Morris had in his own individual capacity any position which entitled him to demand an assignment of the complainants' bond, and if he had any such it was certainly not disclosed to the complainants' solicitor at the time of the offer to pay the money, so that it might clearly be known in what right the demand was made; nor has it been shown that the complainants' solicitor, of whom alone the request was made, had any power to assign the complainants' bond to Mr. Morris either in satisfaction of payment offered or in recognition of a lawful offer to redeem.   Presumably after suit was brought the bond was in the hands of the complainants' solicitor for collection, and, if

payment was made, cancellation and delivery of the bond might be held to be incidental to the business he was authorized to do for the complainants. If anyone were entitled to an assignment of the bond, the demand therefor should, in my view, have been made upon the obligee or owner. A solicitor engaged in collecting a bond by foreclosure of a mortgage securing it, has not, as incidental to that business, power to assign it. If a demand for an assignment upon tender of amount due to a solicitor is to be supported, it must be proven that a power to assign has been given by the holder to the solicitor.

The date of the subsequent payment to the clerk of this court was not stated in the answer, nor was it definitely proven, but I am satisfied that the money was not actually paid to the clerk until after the additional complainants had been admitted and some time after the answer was filed.

When tender is made after suit has begun, and is set up as a defence, the money must be paid into court with the filing of the answer. *Shields* v. *Lozear*, *7 C. E. Gr. 452*. To be effective, such a payment into court must precede or be coincident with the filing of the answer setting it up. The answer gives notice to the complainant that the money which the defendant contends satisfies her claim is awaiting her acceptance. If it is not in court when the answer is filed, the complainant is not required to take notice of a subsequent deposit which the defendant makes at such time as may suit his convenience. The deposit in court did, however, become forceful as against the complainant when she filed her petition asking to be allowed to take it out of court in satisfaction of her bond. This application was an acceptance of the tender, and was filed on the 23d day of March, 1896.

On February 4th, 1896, long before the date of the actual payment to the clerk, or the application of Josephine Whittaker (the original complainant) for the money, the other complainants, William H. Searles and Adam B. Searles, had been admitted as complainants in respect of their $1,700 bond also secured by complainants' mortgage, and the cause was proceeding with them as complainants. No pretence of a tender of the amount due on their bond has been set up.

The defence of a tender which satisfied the complainants' claims and should have terminated the further running of interest and costs, is, therefore, a failure as against either the original or the substituted complainants.

The second point argued is the question, Was the bond (secured by the complainants' mortgage) which was formerly held by Edward B. Searles, and is now claimed to be held by the defendant Henry B. Miller, a lawful and unsatisfied claim?

The defendant Henry B. Miller, in his answer, states that long before the bill in this case was filed, he furnished the money to take up this bond, and took an assignment of it and of Edward B. Searles' interest in the complainants' mortgage securing that bond.

The complainants' claim is that the bond was paid by the Belvidere Roller Mill Company, under its covenant, in its deed for lot No. 1. On April 6th, 1895, Edward B. Searles assigned this bond to L. De Witt Taylor under these circumstances: Taylor had procured a judgment against Searles for one of his clients, and an order for discovery &c. in aid of his execution. He heard that Searles had this bond, procured an order forbidding its payment, saw Searles, induced him to assign the bond to him (Taylor), and to allow the amount due on the judgment in part payment for the bond. Taylor paid the balance due on the bond in cash. Taylor swears that he was not then attorney for the Belvidere Roller Mill Company; that he did this with his own money, and that the bond became his individual property. Edward B. Searles intimates in his testimony that he supposed, in his dealings with Taylor, that he was receipting and discharging, and not transferring, the bond. But he does not deny that Taylor took the assignment as above stated, and that he understood Taylor was going to use it to get the money back. It is obvious that Taylor expected to collect the bond for the benefit of his client for whom he had judgment.

If Taylor had paid off and satisfied the bond, there would have been no reason for Edward B. Searles allowing the judgment to be credited as part payment for the bond, which both agree was done. I think at this stage of this transaction the

bond was not paid by the Belvidere Roller Mill Company, but was lawfully transferred to Taylor and was unsatisfied in his hands. On June 22d, 1895, Taylor assigned the bond to the defendant Henry B. Miller under these circumstances: Not very long, perhaps a week or two, after Taylor had received the bond, he applied to Mr. Yetter, the secretary and treasurer of the Belvidere Roller Mill Company (the owner of lot No. 1, and under covenant to pay this bond and others secured by the complainants' mortgage), and asked him to furnish the money for this assignment. Mr. Yetter swears he loaned the money to Taylor, and produced a check dated April 17th, 1895, indicating that at that date a check for $454.10 was drawn against the account of the Belvidere Roller Mill Company. Mr. Yetter testifies this check of the Belvidere Roller Mill Company was given to Taylor for the bond which Taylor had taken up; that Taylor wanted to use the money which he had advanced on this bond, and a party intended to furnish it later. The company had some money at the time, and Yetter states that he, as treasurer, took Taylor's due-bill for it and loaned him the money, not getting the bond. On June 21st, 1895, the defendant Henry B. Miller gave his check, not to Taylor, but *to the Belvidere Roller Mill Company*, for $450, and on June 22d, 1895, the bond was assigned to him by Taylor.

It is quite evident that, from April 17th, 1895, to June 21st of that year, the money of the Belvidere Roller Mill Company had been put up to satisfy a request made upon it to raise the amount due on this bond. That company had obligated itself, by its covenant in the Ott deed, to pay this bond and others, and had paid a number of them. The death of Frederick Searles had brought the bonds to be due. In response to a request for the money due on this bond, that company's check was used, it is claimed, not to pay, but to loan, the amount to the holder, and two months after, on Henry B. Miller's check drawn to the company's order, and on which by the endorsement it appears to have received the money, the bond was assigned by the holder to Mr. Miller. How it came about that the company should be paid by Miller for a bond it claims it did not own, and that a

transfer of the bond should be made the next day to the party
who paid the money to the company, is not explained.

The impression I have received from the evidence as to this
transaction is that Mr. Taylor secured the bond as he testified;
that he wanted the money ·on it; that he demanded it of the
company which had covenanted to pay it; that it could not
refuse payment, and that its treasurer adopted the subterfuge of
a pretended loan of the company's funds until an arrangement
could be effected by which the bond could be assigned to some
one else than the company, to create the appearance that it was
still outstanding. The payment by Miller to the company,
while he got the assignment from Taylor, satisfies me that the
company, after its payment of the amount of the bond to Taylor,
was the real owner of it, and the subsequent assignment by
Taylor to Miller was made at the company's instance to avoid
the appearance of payment of the bond. The company which
had agreed to pay this bond was, in this view, the real owner of
it from April 17th to June 22d, 1895, and being by its covenant
in the Ott deed, under the construction given to such a covenant
(in the cases of *Klapworth* v. *Dressler, 2 Beas. 62; Hoy* v.
*Bramhall, 4 C. E. Gr. 570,* and *Stiger* v. *Mahone, 9 C. E. Gr.
430),* the principal debtor, and bound to pay this debt, its action
was in effect a performance of its agreement ·to make payment
of the bond; and having thus satisfied its own debt, its subse-
quent procurement of the assignment to Miller was a nullity as
against the other parties secured by the mortgage.

The third point discussed was as to the order of sale and
application of the several lots mortgaged to secure the complain-
ants' debts. It is insisted with great vigor, for the defendant
Philip M. Miller, that the undertaking of the Belvidere Roller
Mill Company to pay the four mortgages as part of the consid-
eration money of the conveyance of lot No. 1, by Levi Ott to
that company, by deed of August 18th, 1890, was a personal
covenant only, not attaching to lot No. 1 nor charging any equi-
table burden upon it to respond first to the payment of the four
mortgages assumed to be paid by the company as part of the
consideration of the conveyance. It is further urged that the

conveyance to Roderick B. Searles of lots Nos. 2, 3 and 4 by Adam B. Searles, was in fraud of his (Adam's) creditors, and that lots Nos. 2, 3 and 4, the title to which stands in the name of Roderick B. Searles, the fraudulent grantee, should be treated as if held by Adam B. Searles, the fraudulent grantor, and that they should be first sold to pay the mortgage debts.

The mortgage being foreclosed in this suit is subsequent to two of the mortgages named in the deed as assumed to be paid by the Belvidere Roller Mill Company, grantee. As to these two, the bill asks no relief and asserts no equity. There is no reason that the holders of these prior mortgages should be made parties. The sale will be subject to these prior liens. The other mortgage given by Searles to Morris and others on May 23d, 1890, has been foreclosed, and the defendant Philip M. Miller, by purchase at the sheriff's sale, holds title under it.

The question involved is the superiority of the equities of the several contesting parties—the complainants, the defendant Philip M. Miller and the defendant Roderick B. Searles. To determine this it is necessary that their relations to each other, touching the four several tracts constituting the mortgaged premises, should be first ascertained. On and prior to May 22d, 1890, Adam B. Searles owned all of the tracts. The complainants are his creditors as holders of his bonds secured by complainants' mortgage, which became a lien on all four tracts on May 22d, 1890. The defendants Henry B. Miller, John Morris and L. De Witt Taylor claim to occupy the same position. The defendant Philip M. Miller is the purchaser of lot No. 1 of the mortgaged premises, under the foreclosure of a mortgage made by Adam B. Searles to Robert E. Morris and others on May 23d, 1890, and is entitled to stand in the place and assert the equities of the Morris mortgage. All these parties are, therefore, creditors, or entitled to the equities of creditors, of Adam B. Searles, the complainants, and the defendants Henry B. Miller, John Morris and L. De Witt Taylor, claiming under the complainants' mortgage as of the date of May 22d, 1890, and the defendant Philip M. Miller, under the Morris mortgage as of the date of May 23d, 1890.

At the time of the making of both these securities Adam B. Searles was in great financial distress. These two mortgages were both made to secure the payment of his. *bona fide* debts. He was unable to effect a settlement with another of his creditors, and to prevent him from realizing his claim, Searles conveyed lots Nos. 2, 3 and 4 (mortgaged to the complainants) to his son, Roderick B. Searles. This is the testimony of Adam B. Searles himself. He also conveyed lot No. 1 (the mill property) on the same day to one Levi Ott, for the nominal consideration of $1, in order, as he testifies, " to give time that I might dispose of this property.    *    *    *    The proceeds of the property if it was sold would come to me." In the deed to Ott was inserted a recital to save Ott's claim, as one of the mortgagees in the Morris mortgage of the lot conveyed, from the operation of a merger.

Both Ott and Roderick B. Searles appear to have known that the purpose of these conveyances was to delay the creditors of Adam B. Searles. The latter appears to have had the control of the property conveyed by both deeds quite as completely after as before the conveyances were made. Indeed, it is fully testified by Adam B. Searles himself that the deed to Roderick was made to avoid the judgment about to be entered in a suit pending in favor of the pursuing creditor, Mr. Hess, and he (Adam) has had the rents ever since. The deed to Ott was made at the same time and was parcel of the same transaction induced by the same purpose, and the same control was retained by Adam B. Searles over lot No. 1 conveyed by it. In my view, both these deeds were made to hinder and delay creditors, and were fraudulent and void under the statute of frauds.

They must, therefore, so far as they relate to the claims of these creditors, be treated as if they were ineffective and the title still remained in Adam B. Searles. When the mortgage of the complainants was made on May 22d, 1890, it became a lien on lots Nos. 1, 2, 3 and 4. When the mortgage to Morris and others was made on May 23d, 1890, on lot No. 1 only, the mortgagees, Morris and others, took with their mortgages an equity entitling them to require the complainants to resort in the

first instance for satisfaction of their mortgage to the other lots, Nos. 2, 3 and 4, mortgaged to the complainants, upon which the Morris mortgagees had no lien, and to look to that lot No. 1, on which they had a lien, only for the residue of the complainants' claim which might remain unpaid from the sale of the other lots. This principle of so marshaling the assets of a debtor that all his creditors may be paid, is a well-established head of equity jurisprudence, and is always applied in cases where it is not injurious to the superior claim of the precedent mortgage, and no superior equity has affected this property. In the matter in hand there does not appear to have existed, at the time the Morris mortgage was taken, any reason why the application of this rule would affect the complainants' lien injuriously. All the mortgaged lots then belonged to the common debtor, Adam B. Searles. Lot No. 1 was a separate and distinct property having a special use. Lots Nos. 2, 3 and 4 are not shown to have had any such relations to No. 1 as would require that they should all be sold as an entirety. As the parties stood at the time the Morris mortgage was made, the only party to be affected was Adam B. Searles, the common debtor. All the lots must, in any event, stand to pay the complainants' mortgage, but the complainants cannot resist such order of application for that purpose as may protect the claims of the Morris mortgagees, if it is not injurious to the complainants. Adam B. Searles' interest in the property, held by him when the Morris mortgage was given, might be affected, but by the mortgages which he had made he had charged the lots with the payment of these debts, and he had no equity which he could assert against such an application of the premises mortgaged as would most nearly pay all of the mortgages. As against him the right of the creditor to have the assets marshaled was absolute. *Herbert* v. *Mechanics' Building and Loan Association, 2 C. E. Gr. 503, 504.* As between the parties interested in the lots at the time the Morris mortgage was given, the right of the Morris mortgagees to have the assets marshaled seems to have been unquestionable. It only remains to inquire whether the subsequent events have taken from them their existing equity.

After the Morris mortgage had been given and recorded, the

deed conveying lots Nos. 2, 3 and 4 to Roderick B. Searles was made. If this had been a *bona fide* deed for a valuable consideration paid, without notice of the outstanding equity of the Morris mortgagees to have the assets marshaled, the purchaser would have received an interest superior to the latent equity of the Morris mortgage. *Herbert* v. *Mechanics' Building and Loan Association, 2 C. E. Gr. 499.* But, as has been shown, this deed was a mere sham to avoid or postpone the payment of Adam B. Searles' debts. It had no operation as against Adam B. Searles' creditors who held the Morris mortgage. Their equitable right to have the complainants' mortgage first paid, if possible, out of lots Nos. 2, 3 and 4, was unaffected by such a deed, and so remains to this day, as Roderick B. Searles still holds the title to those lots. No court of equity would permit a debtor, as against whose property an equity had become established, even though it be latent, to nullify its effect by making a purely voluntary deed. To allow this would make such equitable rights not absolute as against the debtor, but existing solely at his will. Nor has the fraudulent voluntary grantee any *status* to question the justice of this rule, for it does not injure him. He has parted with nothing, and has not changed his position so that he would lose anything by the enforcement of the equity. His deed is unquestionably within the operation of the statute of frauds, and therefore absolutely futile to vest any rights in him as against the creditors of Adam B. Searles, his grantor. The conveyance to Roderick B. Searles did not, in my view, in any way deprive the Morris mortgagees of their right to marshal the assets.

Next comes the inquiry whether the deed made by Adam B. Searles to Levi Ott, on May 23d, 1890, conveying lot No. 1, in any way destroyed this equity of the Morris mortgagees. But the same criticism applies to this transaction. This conveyance of lot No. 1 was purely voluntary, for a nominal consideration and in fraud of Searles' creditors. It contained a covenant of general warranty, and although it excepts the mortgages in question from the covenant against encumbrances, they are not excepted from the general warranty. If this deed had been for a full and valuable consideration paid, Ott would himself have

had a right to the same equity as the Morris mortgagees to compel the satisfaction of the complainants' mortgage in the first place out of lots Nos. 2, 3 and 4. As it was a voluntary and fraudulent deed, it had no effect to give him any rights as a *bona fide* purchaser. He took the same place which his voluntary grantor had held, and no more.

The next step in the title came by the deed of August 18th, 1890, from Ott to the Belvidere Roller Mill Company. By this *bona fide* deed, Ott imposed upon that company a covenant to pay off these two mortgages as part of the consideration money of the conveyance, and it is claimed that the defendant Philip M. Miller purchased from the Belvidere Roller Mill Company by sheriff's sale, with notice of this covenant, and that he stands in the position of that company, and *Engle* v. *Haines, 1 Halst. Ch. 186*, is cited in support of the position.

Since *Finley* v. *Simpson, 2 Zab. 311*, it has been uniformly held that such a covenant as that inserted in the deed to the Belvidere Roller Mill Company, is, if the deed is accepted by the grantee, binding on him, though the deed is signed by the grantor only. This obligation enures in equity to the benefit of the mortgagee, who has by the covenant assumed the payment of the mortgage debt. *Klapworth* v. *Dressler, 2 Beas. 62; Hoy* v. *Bramhall, 4 C. E. Gr. 570*. But there is no compulsion upon the mortgagee, whose debtor has thus provided an additional covenant for the payment of the mortgage debt, to accept the benefit of this covenant and resort to it at the sacrifice of other equities. The rights of the mortgagee against the purchaser are adjudged not because of any original equity in him, but to avoid circuity of action and to save the mortgagor from being harassed for payment of the debt, and then being driven to seek relief from the purchaser upon whom the ultimate liability must fall. *Crowell* v. *Hospital of St. Barnabas, 12 C. E. Gr. 656*. The mortgagee, by the covenant, becomes entitled to be substituted in the place of the mortgagor, but he is under no obligation to enforce the covenant unless he chooses to do so. He may look only to his mortgage and to its equities, if he likes. Nor can the taking of such a covenant by the mortgagor, from the pur-

chaser, force the. mortgagee to give up the equities attendant
upon his mortgage, and to accept in their place the covenant of
some party of his debtor's selection to pay his debt.    The equity
to have the securities marshaled, outstanding in the mortgagees
having a lien only upon one fund, can only be taken away by
the consent or act of those mortgagees themselves, or by the
intervention of some superior equity, as that of a *bona fide* pur-
chaser without notice.

The Belvidere Roller Mill Company is in no way harmfully
affected by the marshaling of the securities.    It has bound itself,
as purchaser of lot No. 1, to pay both the complainants' and the
Morris mortgage debts, and it cannot be injured if the equity
of the Morris mortgagees to require the complainants to look
first to lots Nos. 2, 3 and 4 is enforced.    It does not resist its
enforcement.    The party unfavorably affected is Roderick B.
Searles, the owner of lots Nos. 2, 3 and 4.    If he can compel
the complainants to look first to lot No. 1 for their mortgage
debt, he can retain lots Nos. 2, 3 and 4, in accordance with the
original fraudulent plan, to avoid payment of Adam B. Searles'
debts, because there will probably be sufficient proceeds of lot
No. 1 to pay the complainants' debt, without calling on lots
Nos. 2, 3 and 4, and the Morris mortgage is no lien on the latter
three lots.

It was held in *Herbert* v. *Mechanics' Building and Loan
Association, supra,* that the right of a second mortgagee to have
the assets marshaled was superior to the right of a judgment
creditor of the mortgagor who had acquired a lien upon the
assets included in the first mortgage, but not in the second,
and which were sought to be first charged.    The principle pro-
pounded is that the equity of the second mortgagee is vested in
him on the taking of his mortgage.    The mortgagor's subse-
quent judgment creditors have no higher rights than the mort-
gagor; their equity is inferior.    The equity is absolute as to the
debtor himself, is subject to the legal and equitable claims of
prior creditors, but cannot be impaired or in any way injuriously
affected by the intervention of those of a later date, unless they
be *bona fide* purchasers without notice, or holders of some other

superior equity. So in this case, in my view, the equity of the Morris mortgage and of the defendant Philip M. Miller, who has succeeded to its rights by his purchase at the sheriff's sale, is superior to any rights arising upon the after-created covenant imposed by the mortgagor or his grantee. I cannot regard Roderick B. Searles as a *bona fide* purchaser in any aspect of his relations to this case. If there be any virtue in the covenant made by the Belvidere Roller Mill Company to assume the payment of these mortgages, let those who are injured by its breach bring their action therefor. It cannot, in a court of equity, under the circumstances recited, deprive the parties interested of equities existing before that covenant was made. Neither the mortgagor nor his fraudulent grantee, Roderick B. Searles, can compel the first mortgagee to resort first to that tract upon which the first and second mortgages are both liens, and thus free the other tracts not included in the second mortgage, nor can they deprive the second mortgagee of his equity to have the assets so marshaled that both mortgages may, if possible, be paid.

It is mistakenly assumed that Philip M. Miller, who purchased at the foreclosure sale under the Morris mortgage, occupies the position of a grantee from the Belvidere Roller Mill Company, and that he is bound by its covenant entered into by the acceptance of the deed from Ott, of which Miller had notice. The title acquired by Philip M. Miller, the purchaser at the foreclosure sale under the Morris mortgage, was not that of the Belvidere Roller Mill Company, charged with the equities incumbent upon that company. The purchase at a foreclosure sale relates back to the title passed by the mortgage foreclosed, and conveys to the purchaser the estate which the mortgagor had in the mortgaged premises on the day of the delivery and record of that mortgage, freed from subsequent equities, unless superior by reason of lack of notice &c., as hereinbefore discussed. In the case under consideration, the defendant Miller, by the deed from the sheriff, acquired the title which Adam B. Searles had on the 23d day of May, 1890, when he delivered the mortgage to Morris and others with all its attendant equities, and free from equities which Searles or subsequent holders of the prop-

erty had afterwards imposed on it.    In the case of *Engle* v. *Haines,* above cited, the grantor received a title of a date not prior but subsequent to the imposition of the covenants, and it was properly held that his estate was subjected to the payment of the purchase-money.

Upon all the questions argued I will therefore advise, first, that there has been no tender shown; second, that the bond formerly held by Edward B. Searles, claimed to be assigned to Henry B. Miller, has been paid; third, that the lots Nos. 2, 3 and 4, held by the defendant Roderick B. Searles, should be first sold and the proceeds applied to the satisfaction of the bonds secured by the complainants' mortgage and costs of fore-closure, and lot No. 1, held by the defendant Philip M. Miller, should be secondly sold and its proceeds applied to satisfy any balance remaining due on the complainants' mortgage; that an order of reference be made to a master to ascertain and report the amounts due &c., on which reference the evidence taken on the hearing may be used, subject to these conclusions.